IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAYVON R. FLEMMING,

                Plaintiff,

  v.

MCKENIN HAUCK and THEODORE ANDERSON,

                Defendants.

OPINION and ORDER

20-cv-634-jdp

---

Pro se plaintiff Jayvon R. Flemming contends that that prison staff at Columbia Correctional Institution violated his Eighth Amendment rights by failing to protect him from engaging in self-harm. Defendants have filed a motion for summary judgment. Dkt. 15. I have assumed for purposes of summary judgment that the relevant events occurred as Flemming says they did. But even under Flemming's version of events, no reasonable jury could conclude that defendants knew that Flemming might imminently harm himself or that defendants failed to take reasonable measures to prevent him from doing so. Accordingly, I will grant defendants' motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

In May 2019, plaintiff Jayvon Flemming was incarcerated at Columbia Correctional Institution, where defendant Theodore Anderson was a security lieutenant and defendant Dr. McKenin Hauck was a prison psychologist. Flemming has a history of mental illness, including self-harming behavior and attempted suicide. Defendants Anderson and Hauck were aware of Flemming's history of engaging in self-harm. But based on Hauck's interactions with Flemming,

Hauck thought that Flemming frequently made insincere threats of self-harm as a means to get staff attention, to control his placement or property, to avoid negative consequences, or to retaliate against staff.

On May 26, 2019, Flemming was housed in general population. He made threats of self-harm, and the on-call psychologist ordered that Flemming be placed on observation status. (Placement on observation status is determined by psychological services staff, and it requires that security staff check on inmates every 15 minutes.) The next day, defendant Dr. Hauck was working at the prison as the on-call clinical psychologist. Sometime after 11:00 a.m., Hauck and Anderson were on the restricted housing using checking on another inmate who was on observation status. According to Hauck, Flemming tried to get her attention and told her that he was not feeling suicidal and wanted to be removed from observation. Hauck's observation notes from that day state that Flemming "presented with appropriate mood and affect," showed "no signs of overt distress," and "expressed that he was motivated to participate in a family visit that day." But according to Flemming, Hauck did not evaluate him or talk to him about how he was feeling while she was on the unit.

Hauck reviewed the observation log on which security staff had recorded Flemming's behavior throughout the previous night. The log noted that Flemming had been upset during the night and had threatened to cut himself with a staple because he did not immediately receive the toilet paper he requested. Flemming did not hurt himself, and eventually gave the staple to a supervisor. The log also noted that Flemming had been sleeping, rapping, and talking with another inmate on the unit. Hauck concluded that Flemming should be removed from observation status based on her observation of Flemming on the unit and security staff's observation log. She wrote in her observation notes that:

2

> Although contact with Inmate Flemming was brief, he presented with appropriate mood and was not endorsing thoughts, intent, or plans to engage in self-harm. Additionally, he had not engaged in any self-harm behaviors. On one occasion he had held a staple up and threatened self-harm, ultimately handing the staple out to staff. This was a behavior that was motivated to receive attention and as an attempt to obtain the toilet paper he was upset that he had not received at the moment of his asking. Documentation showed that Inmate Flemming had been socializing with peers on the unit, eating, sleeping, and also singing/rapping.

Hauck told defendant Anderson that Flemming should be removed from observation status. But instead of sending Flemming back to general population, Anderson decided that Flemming should be placed on control status because he had been disruptive and disrespectful while he was on observation status. (Control status is determined by security staff, and it requires that security staff check on inmates every 30 minutes. Inmates on control status do not have access to their property unless authorized by security staff.) In accordance with prison policy, Flemming was strip-searched before being transferred to control status. During the strip-search, Flemming told officers that he was coming from observation status, that he was clearly suicidal, and that he had a history of harming himself. While being placed in control status, Flemming yelled out to Anderson several times, "I'm letting you know right now that I'm fitting to engage in self-harm" and "I'm letting you know right now that I'm going to engage in self-harm." Anderson notified psychological services staff about Flemming's statements. Anderson also conducted a briefing on camera after placing Flemming on control status, during which Anderson stated that he had observed Flemming and believed that Flemming was threatening self-harm as a means to gain access to additional property.

A psychological staff member contacted Dr. Hauck about Anderson's message that Flemming had reported suicidal thoughts after he was told that he was being placed on control status. Hauck thought that Flemming was expressing suicidal thoughts to staff because he was

3

upset about being placed on control status, and not because he was clinically depressed or genuinely suicidal. She concluded that Flemming should not be placed back on clinical observation because doing so would reinforce Flemming's attention-seeking behavior.

Approximately two hours after Flemming had been placed on control status, Captain Julson contacted Hauck to tell her that Flemming had cut his arm with a paperclip and inserted the paperclip into the wound. Julson told Hauck that Flemming was going to the local emergency room for stitches and to have the paperclip removed from his arm, but that Flemming was being calm and cooperative. Julson stated that Flemming did not appear to be depressed, but instead appeared to be trying to secure placement in clinical observation. Julson contacted Hauck again after Flemming returned from the hospital, stating that Flemming was in "good spirits," continued to be calm and cooperative, and denied thoughts or plans to hurt himself. Hauck concluded that Flemming did not need to be placed on observation status.

ANALYSIS

Flemming contends that defendants Dr. Hauck and Lt. Anderson violated his Eighth Amendment rights by failing to protect him from harming himself. In particular, he argues that Hauck should not have removed him from observation status without conducting a thorough evaluation of him, and that Anderson should have done more to protect him after he was placed on control status. Prison officials violate the Eighth Amendment if they are aware of an objectively serious risk of harm to an inmate and knowingly or recklessly disregard it. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). To prevail on his Eighth Amendment claims, Flemming would need to prove that: (1) at the time he interacted with defendants, there was a strong likelihood that he would seriously harm himself in the near future; (2) defendants knew of that

strong likelihood; and (3) defendants consciously failed to take reasonable measures to prevent Flemming from harming himself. *See Lisle v. Welborn*, 933 F.3d 705, 716–17 (7th Cir. 2019); *See Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012). Defendants contend that Flemming has not adduced evidence to show that they knew of a strong likelihood that he would seriously harm himself or that they failed to take reasonable measures to protect him.

Defendants are correct. The undisputed evidence shows that neither Anderson nor Hauck thought it was likely that Flemming would imminently and seriously harm himself if he was taken off of observation status and placed on control status. Both defendants made contemporaneous records explaining their reasons for discounting Flemming's threats of self-harm. Anderson stated in a video briefing that he had observed Flemming and believed that Flemming was threatening self-harm as a means to gain access to additional property. Hauck wrote in her notes that she thought Flemming was using threats of self-harm to avoid being placed on control status and to get attention from staff. Hauck thought that placing Flemming back on observation status would reinforce what she believed were his attention-seeking behaviors. Hauck also noted that Flemming had not engaged in self-harm during his 13 hours on observation and that he had shown self-control by giving a staple to prison staff. Because defendants doubted the sincerity of Flemming's threats of self-harm, they did not subjectively know that Flemming faced a substantial risk of serious harm. *See Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (defendants not liable under Eighth Amendment if they did not subjectively know of "the significant likelihood that an inmate may imminently" harm himself).

Flemming does not genuinely dispute whether Anderson and Hauck thought his threats of self-harm were sincere. He does not deny that he had previously used threats of self-harm in

5

an attempt to control staff or gain access to property. And the evidence shows that during the relevant time period, he threatened to harm himself when he was dissatisfied with staff decisions, such as the denial of toilet paper and his transfer to control status. But Flemming argues that, even if defendants doubted the sincerity of his threats, they were obligated to place him back on observation status and conduct a more thorough evaluation once he told prison staff that he was feeling suicidal and was going to harm himself.

Flemming's argument is contrary to Eighth Amendment law. Prison staff are "neither required nor expected to believe everything inmates tell them," *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014), and prison staff "who reasonably disbelieves a prisoner's assertion is not liable just because it turns out to have been true." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). *See also Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (ignoring "an insincere suicide threat from an inmate wanting nothing more than attention" does not confer liability under the Eighth Amendment); *Szopinski v. Koontz*, 832 F. App'x 449, 451 (7th Cir. 2020) (defendants not liable under Eighth Amendment for failing to prevent inmate from harming himself where they had no "reason to believe that his threats to harm himself were genuine, rather than a manipulative ploy to get placed under observation"). In this instance, the undisputed facts show that defendants thought that Flemming was making insincere threats of self-harm to manipulate staff. Hauck also thought that, based on her professional judgment, it would be unhelpful to give Flemming what he demanded each time he threatened self-harm. Because Flemming has not submitted evidence to refute the sincerity or reasonableness of defendants' beliefs, he cannot prove that defendants deliberately disregarded a substantial threat to Flemming's health or safety.

And even if defendants thought that Flemming's threats of self-harm might be genuine, they did not disregard his safety. Defendants knew that Flemming was being moved directly from clinical observation to control status. He would be monitored every 30 minutes by security staff, he would not have access to his property, and he would be strip-searched to minimize the risk that he could bring items into his cell with which he could harm himself. Flemming did not tell defendants how or when he intended to harm himself, and he has submitted no evidence suggesting that defendants knew that he might access a paper clip or other means by which he could seriously and imminently harm himself in control status. So even though Flemming had shouted to staff that he was going to harm himself, it was reasonable for defendants to believe that Flemming would be unable to imminently engage in serious self-harming behavior while on control status. *See Wright v. Funk*, 853 F. App'x 22, 24 (7th Cir. 2021) (prisoner's statement to defendants that "he was having suicidal thoughts and would like to speak with someone from the psychological services unit" did not make defendants aware that prisoner faced substantial and imminent risk of self-harm); *Johnson v. Garant*, 786 F. App'x 609, 610 (7th Cir. 2019) (prisoner's statements that "he felt suicidal and wanted to speak to a crisis counselor" were not sufficient to make defendants aware that prisoner faced a substantial and imminent risk of self-harm).

Finally, Flemming argues that defendants' refusal to place him on observation status after he had successfully cut himself and returned from the hospital shows that defendants did not care about his safety. But as I explained in the screening order in this case, Flemming was not permitted to proceed on any claims based on events that occurred after his hospital visit because Flemming did not allege that he suffered any injury after that time. *See* Dkt. 6, at 4.

Defendants cannot be held liable under the Eighth Amendment for decisions that caused Flemming no harm.

In sum, Flemming has failed to submit evidence from which a reasonable jury could conclude that defendants failed to protect Flemming despite knowing that he faced a substantial and imminent risk of engaging in self-harm. Accordingly, defendants are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants, Dkt. 15, is GRANTED.
2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered January 7, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge